Good afternoon, Your Honors. May it please the Court, Counsel. Joe Jones on behalf of Fleet Truck Sales. We're asking the Court to reverse two summary judgment rulings entered against Fleet at the District Court. The standard for review is de novo on all the issues in this appeal. There's two basic issues in this appeal. First, is Fleet, my client, limited to the liquidated damages even after defendant's material breach of the contract and under the Court's interpretation of the contract. The second issue is whether it was error for the Court to dismiss Celadon Group, Inc. at summary judgment. This case involves the breach of two sales contracts entered into, the purchaser was named as Quality Equipment Sales. That's the same fictitious business name that Celadon Group used in a series of contracts in 2010 when it purchased commercial trucks from Fleet at that time. There were 332 used trucks at issue at a sales price of over $19 million. After the 2010 contracts were completed in the name of Quality Equipment Sales by Celadon, the Fleet sales guy who was involved in them follows up with Celadon, the same guy from Celadon, the Chief Operating Officer for Celadon in 2015 and says, are you interested in buying more trucks? What the Celadon officer tells him at that time is, I don't know what our inventory needs are at this time, but your point of contact for our purchasing needs is Danny Williams. So Fleet follows up with Danny Williams, they enter into two contracts, one in March, one in May. Just like the ones in 2010 in the name of Quality Equipment Sales and they're paid for by a Celadon company. Then come the two contracts in September that were breached. Those were also in the name of Quality Equipment Sales, this fictitious business name. At no time after Celadon Group directed Fleet to work with Danny Williams on their purchasing, on Celadon's purchasing, did anyone ever tell Fleet that Danny Williams wasn't buying trucks on behalf of Celadon Group. So the defendants breached the September contracts and what happens after that, they don't even pay the cash deposits that could have operated as liquidated damages. And what happens after September of 2015 is the bottom starts to fall out of the used commercial truck market. And by mid-January, when the defendants finally say, hey, the trucks we wanted, we promised, we said we're going to pay for, you better sell to somebody else. And by then, it's kind of too late. The bottom has dropped and the difference in the sales price and what they could ultimately sell over the next six months is over $7 million, just the difference in the sales price alone. On the liquidated damages, we have three reasons why Fleet's damages should not be limited to liquidated damages. First is that the defendants materially breached this contract for failing to pay the cash deposits. There's no question here that failing to pay the cash deposits under Nebraska law and really everywhere is a material breach of the contract. Cash deposits has still not been paid. The court really didn't address this issue other than to say that we're limited to liquidated damages under the contract. What defendants say in response to this argument is that, well, what the court said was right and we're not really seeking a benefit under this contract. Well, I beg to differ. The liquidated damages are approximately $150,000. Our damages just in the sales price alone is over $7 million. That's not just a benefit they're seeking, that's a substantial benefit they're seeking. It's the reason we're here. Second reason we're entitled to more than liquidated damages is the word retained in the contract that appears in two different places. First on the first page of the contract on page one, under notices to purchaser, it says that seller may retain the cash deposits as liquidated damages. If they do that, then you go to paragraph two on page two. It says may retain there, and then if they elect and you go to paragraph two on page two, it says there that the purchaser understands and agrees that the seller shall retain as liquidated damages those cash deposits. There's no question here that the word retained means to keep something you already have. In order for that to be operational here, for this The cash deposits were never paid. That's a condition precedent. We can't retain what we don't have, and for that reason, we're not limited to the liquidated damages. Your view is that had they paid the cash deposits, then your damages would be liquidated? No. It's just a ... I mean ... Well, yes. Let me think. No. Because if you had retained the cash deposits according to the paragraph two, if those were in your hands, then we wouldn't be here? That would have been your liquidated damages? That would have gotten rid of our first two arguments. They wouldn't have materially breached because they would have paid, and we could have retained them. We go to our third argument, which is the word may on the first page of the contract that says we may retain the cash May gives Fleet the option to decide, okay, we're going to either keep them, and if we do that, you go to paragraph two on page two, or we have the option to seek actual damages. What the lower court said may meant was that we could give the ... No, no, no. What the returned the cash deposits to defendants, and then turned around and asked for it back in the event of breach. That's not a commercially reasonable interpretation. Defendants go one step further, apparently realizing that's not a commercially reasonable interpretation for the word may, and they say, well, they may have forgiven damages altogether. That's what may means. A party always has the right to forgive and forget, but that means they would have paid the $150,000 had they received it, paid it back, and said, go on your way. We don't care. Again, because that right is in every party to forgive a breach, it wouldn't have been put in a contract. That's not a commercially reasonable provision to put in a contract. Those are the three reasons. We only get to the third reason if the first two ... If they would have paid. Why include then a sentence that says the parties agree that it would be impractical and extremely difficult to determine the actual damages in the event of a breach by either party? That's pretty broad. Yes. Our position is that that paragraph two on page two becomes operable as important if the election is made to seek the liquidated damages. They wanted an enforceable liquidated damages clause because that was one of the options they had. Those are words often found in liquidated damages clause to make those clauses enforceable under Nebraska law and the law of other places. That's why that language is in there, but that doesn't take away the meaning and the effect of the word may on page one. Moving on to the error committed, unless Judge Grunder, you have a question? I'm not sure I can formulate it exactly, but this worked both ways, right? Yes. Let's posit that the market moved the opposite direction and your client decided to breach. Would they be limited just to the cash deposit amount? Yes. There's a specific sentence that says both parties are limited to the cash deposit and then two lines below that is a more specific provision that goes to this specific instance if purchaser breaches. If purchaser breaches, then re-retain. There's no way for, under the way this works, they obviously don't retain the cash deposit. They have to pay the cash deposit. Even if it wasn't paid? If it wasn't paid and we breached, then they would have already had their damages because they hadn't paid it to begin with. There's two reasons why Celadon is liable under these contracts. First reason is that it's doing business quality equipment sales. Can I ask a preliminary question? Yes. If, hypothetically speaking, you were to lose on the first issue, would it be necessary for us to reach this issue? Well, yes, because I have a grave concern that quality is defunct now and has no money. Collectability. Collectability, yes, Your Honor. The first reason is that Celadon was actually doing business quality equipment sales. If you go to their website in 2015, they describe in a particular page how they are doing business as quality equipment sales. The courts, we consider that an admission, a representation that they are doing and were doing business as quality equipment sales. The court's reaction to that was that Fleet failed to offer evidence that Celadon was exclusive to Celadon Group. I have to say I don't know exactly what that means, but my reaction is first that it seemed like that would have been incumbent on Celadon Group to offer any evidence of explanation that that admission isn't exactly what it says it is. But what I do know is that that website is evidence when taken in the light most favorable to Fleet is evidence that a jury could rely on deciding that Celadon actually was doing business as quality equipment sales. We also have the evidence of what happened in 2010. There is no question here that those contracts were negotiated by officers of Celadon Group and no one else. All the information about the purchaser in the 2010 contracts comes from Celadon Group. That's Paul Will and Eric Meeks. So not only do we have their webpage, we have past experience that they are doing business as. Then we have the actual directive from Celadon Group saying I don't know what our needs are right now, but talk to this guy. Talk to Danny Williams. He's in charge of all of our inventory purchasing. So we have a directive from Celadon Group to work with their agent. So not only is that evidence that they're doing business as, but it's also evidence that supports our argument, the second argument, which is that Danny Williams had apparent authority to bind Celadon Group to these contracts. What better evidence is there when the principal, Celadon Group, makes a written directive to a third-party fleet, in this instance, to deal with Danny Williams, their agent, on Celadon's purchases? Celadon Trucking is no longer in the case, correct? Celadon Trucking was never in the case. Never in the case. Okay. What's the relationship between Celadon Trucking and Celadon Group? I don't know. I do know that all the contracts that were paid were paid for by Celadon Trucking. When you look at the detail from the bank, it's Celadon Trucking Services, Inc., even though the position has always been that those sales, especially in 2015, were all quality company sales. They weren't paid for by quality company. They were paid for by a Celadon Group. Group or trucking? Celadon Trucking Services, Inc. And what's interesting about that, also in their website, in Celadon's website, is references to their divisions. They talk about quality companies as a division. They talk about trucking services as a division. And they talk about Danny Williams as being a president of one of these divisions. So they have referred throughout to Danny Williams and these other companies as divisions. And division means a part of the big whole. There's no distinction. Even the email messages talk about quality companies. They don't say Inc. or LLC. That could be president of quality company's division. But also on that email address is the name Celadon Group, Inc. There's the corporation. They should be responsible. I'd like to reserve my last minute for rebuttal. Thank you. Thank you. Thank you. May it please the court, counsel. My name is Nick Sullivan. I represent the Appalese. Celadon Group, Inc., Quality Companies, LLC, and Quality Equipment Leasing, doing business as quality equipment sales. Judge Kelly, to quickly answer one of your questions, there is evidence in the record. Celadon Trucking is a wholly owned subsidiary of Celadon Group. So the way it works is Quality Equipment Leasing, QEL, who was a party to the litigation, is wholly owned by Quality Companies, who is another party to the litigation, who is wholly owned by Celadon Trucking Services, Inc., who, as opposing counsel indicated, was never made a party to the litigation. Celadon Trucking Services, Inc. is wholly owned by Celadon Group, Inc. So that's kind of the corporate structure. The primary issue on this appeal is liquidated damages provision. And to get to your point, I don't know that it really matters, the second issue, as to whether Celadon Group is a party if this liquidated damages provision, the district court's decision on that is upheld. And, again, what we're hearing – Why is that? Because it seems to me collectability – There's a potential collectability issue, but it's relatively minor. I mean, it is an issue that needs to be addressed. And it is a concern. I can see how it's a concern as to whether Celadon Group remains in the case. But I think it's relatively minor, practically speaking, Your Honor. Well, maybe if the money was escrowed or something, it might go away. That's true. In the absence of that, it seems like we might have to deal with it. I think we do have to deal with it. That's true. That is true. But what I'd like to point out is when we're looking at the liquidated damages provision, and this is what Fleet has done throughout this litigation, they gloss over the operative liquidated damages clause in the contract. And that's on page 2 in paragraph 2. And he didn't even talk about it during his argument. And the operative language is this. Thus, the parties agree that liquidated damages in an amount equal to the cash deposit shall be paid by either party who breaches this contract. It's mandatory. It's clear. It's unambiguous language. They didn't even mention it here in argument. I mean, that's the operative liquidated damages clause that's at issue. The notice to purchaser section and then the remaining sections of this paragraph really are not the operative language on the liquidated damage clause. And one thing that is worth pointing out is Fleet is not arguing that this is an ambiguous contract. That's kind of obvious because if it was ambiguous, it would be construed against the drafter. These are standard form Fleet contracts. This liquidated damage language is language that Fleet's parent company, Warner Enterprises, requires in every single one of its purchase orders. So if it was to be construed against Fleet, it would be construed against them. Obviously, that would be detrimental to their position. So they're arguing that it's clear and unambiguous language. If that's the case, Nebraska case law is clear that when a contract is clear and unambiguous, the court is supposed to enforce it according to its terms. The terms of the actual liquidated damage clause here, again, say that thus, the parties agree that liquidated damages in an amount equal to the cash deposit shall be paid by either party who breaches this contract. And I'll get to Fleet's arguments as to why that's not applicable in just a second. But Eighth Circuit case law is clear, Nebraska case law is clear. It's not the province or the court to change the terms of contract because they don't think it's a fair bargain. When a contract is clear and unambiguous, the court's responsibility is to enforce it according to its terms. And that's what the district court did. It found that this was clear, mandatory language that the parties agreed to just because it was a bad deal for Fleet ultimately at the end of the deal. That's just a risk that they ran when they negotiated these contracts with quality companies who was the entity doing business as quality equipment sales at the time the September purchase agreements were entered into. To address... How is quality companies organized? Say that again, Your Honor. How is it organized? It's an LLC. I believe it's an Indiana LLC, Your Honor, organized under the laws of Indiana. Thank you. So how about this argument that your client breached by not paying the cash deposit and therefore doesn't get the benefit of the liquidated damage provision? I agree that our client breached by maybe not paying the cash deposit. But if you look at the actual language of the provision, payment of the cash deposit does not a requirement for the operation of the liquidated damage clause. As Nebraska case law is clear, parties can negotiate to ultimately what the remedy is going to be, which is damages. And that's what they did in paragraph 2 on page 2. What they could have said if they wanted the cash deposit to be a condition precedent or a prerequisite in order for that to become operative, they could have said the parties agree that the cash deposits could be retained as liquidated damages. They could have put that in the actual language of the operative clause, but they didn't do that. What they said is the parties agree that liquidated damages in an amount equal to the cash deposits. So they're basically saying, look, the liquidated damages is going to be in an amount and we're going to make it equal to the cash deposits. It applies to any breach of the contract. It doesn't matter if it's payment of the cash deposits. It doesn't matter if it's failure to take delivery, failure to make delivery. It doesn't matter what the breach was. Even though quality companies never pay the cash deposits, their fleet is still limited to the liquidated damage clause that they negotiated at the outset of the contract. And that kind of also doubletails a little bit with Fleet's argument that, look, we can't take advantage of this clause because we materially breached. Well, they're kind of doing the same thing, right? I mean, if you think about it, what they're saying is, we put together this contract. We require this liquidated damage clause in our contract. But we want out of it, even though it says the parties agree liquidated damages shall be paid in the event of a breach by either party, what they're saying is, no, we don't want that one. We want to just basically, we have the option of pursuing either liquidated damages or actual damages. And that's not what the contract says. And this is especially true. One thing that is worth pointing out, this is especially true given that these are two very sophisticated business entities that are negotiating these contracts. This isn't like a consumer transaction where it's between a commercial entity and it's a mom and pop or an individual consumer where these are not sophisticated business entities. Here you have two sophisticated entities who knew that they were getting into and they had the power to negotiate the terms of this contract. Another thing that kind of strikes me with Fleet's argument is what they're saying is the May language, I mean, what they're saying is failure to pay the cash deposits was a condition precedent or gave them the option as to either pursue liquidated damages or actual damages. But if that were the case, and this is, I mean, the language of the liquidated damage clause says thus, the parties agree liquidated damages shall be paid. That's a mandatory language. I don't think the other party disputes that. What they're saying is because you didn't pay the cash deposits, that ultimately just becomes an option that Fleet has. I mean, if that were the case, then any breach essentially would render the liquidated damage clause meaningless. Meaning if mandatory language is contained in a liquidated damage clause like this and a payment of the cash deposits is a condition precedent, then there could be no breach where the liquidated damage clause... Well, it does in Nebraska law. If you look at the Weber case, it talks about that ordinarily we look to see words like such, if, when, you know, subject to, on condition that. And it does say that that's not mandatory, but there's got to be some marker someplace in the contract that tells us that this is a condition precedent to the contract coming into existence, right? I agree. And if you look at this language and you look at it, what they're arguing essentially is that that language is actually found on page 2. Why are they wrong? Because I think you're right. You're right. In order to have a condition, you need conditional language. And what they're saying is the condition or the option comes in based on the notice to purchaser section, which is on page 1 of the contract where it says notice is hereby given that purchaser may... May or may not retain that. May retain the cash deposits. But the key language there is pursuant to paragraph 2 on page 2, which basically says, hey, look, this is notice to you. Your cash deposits, if you pay them, they might be retained as liquidated damages pursuant to paragraph 2. So go read page 2, paragraph 2. If you do that, that takes you to the mandatory operative liquidated damage provision that's in paragraph 2 of the agreement. Now, what they say after that... So, again, to address your point, there is no conditional language in the contract whatsoever. The second part where they rely on the retain language is, again, in paragraph 2 on page 2 where it says purchaser understands and agrees that in the event purchaser breaches this agreement, seller shall retain the cash deposits as liquidated damages. Again, what they're saying is, well, that retain means it needs to be paid first. But all this clause is doing is... Really what it's doing is making this a foolproof liquidated damages provision. You have a notice on the first page that says, hey, look, if you breach, there's a liquidated damage clause in this contract. Go read the liquidated damage clause. Flip to page 2. Liquidated damage clause says, in the event of any breach, liquidated damage in the amount of the cash deposits shall be paid. And then it says... Then it has the purchaser acknowledge right after that. You acknowledge that your cash deposits shall be retained as liquidated damages. It's a foolproof clause, because they wanted it to be operative. And it was. But the problem is, they don't want it to be operative against them. But that's not what the language of the contract says. And just briefly, I've touched on it already, but the may language on the first page and then the shall retain, that doesn't give them an option to pursue either actual damages or liquidated damages. Nebraska case law is clear when it's a mandatory liquidated damage provision. That's the remedy the parties agree to. And that's the end of the story. I'll quickly address the Celadon arguments. One of the arguments is that... The district court held that Celadon... There was no reasonable trier of fact could be found that Celadon was holding itself out as doing business as quality equipment sales. Now, they rely on a website, which the district court properly got rid of. But what's key about that, and kind of two points on this, really, it's an apparent authority issue. And the first is, under Nebraska law, parties put on inquiry about either an employee's lack of authority or actual authority. And they have a duty, then the other party has an obligation to go figure out what that is. The parties to the 2010 purchase agreements. At that point in time, quality equipment leasing, QEL, who was dismissed from the litigation, was registered to do business as and was doing business as quality equipment sales with Indiana's Secretary of State. Indiana has a requirement. If anybody's operating under a fictitious business name, they have an obligation to go register that. Quality equipment did. They were doing business as quality equipment sales in 2010. If you look at the 2010 purchase agreements, it says purchaser, quality equipment sales. And then at the bottom in the signature line, it says either Paul Will or Eric Meek. It says quality equipment sales by either Paul Will or Eric Meek. That puts them on inquiry right there as to who the actual purchaser is under the agreements. It doesn't say Celadon Group. There's no reference to any Celadon Group in any of these agreements. And Fleet kind of plays fast and loose with references to Celadon Group or Celadon Trucking Services. Celadon Group had absolutely nothing to do with the 2010 purchase agreements. They're not listed as the purchaser. It's quality equipment sales. The party that ended up paying the 2010 purchase agreements was Celadon Trucking Services, but they're not a party to the litigation and they've never been brought in. Just the number of times you've said quality, and I could see you pausing to try to remember which is which. It's kind of confusing. It is confusing, but there's nothing wrong with that. I mean, Nebraska law, it's clear. Parties have the right and corporate formalities are upheld and they're recognized, and corporate entities are treated separately, assuming there's no, you know, commingling of funds or anything like that. There really isn't any evidence of that here. The district court dismissed the piercing the corporate veil theory of liability on summary judgment, and that issue has not been appealed. So it is somewhat confusing, but there's nothing wrong with Celadon Group, Celadon Trucking, quality companies, setting up their structure like that. It's actually exactly what Fleet does. I mean, they're a wholly owned subsidiary of Warner Enterprises. I mean, the parties know who's who and what's going on here. And that kind of goes into the, going back to the 2015 contracts. If you look at all the evidence, the apparent authority is the manifestations of assent that were made by the principal, Celadon Group, to the third party, Fleet Enterprises. The only manifestation is the one statement by Eric Meek that, go talk to Danny Williams, he's in charge of our purchasing now. But if you look at everything in context, you have the 2015 purchase agreements, which say purchaser is quality equipment sales, who at the time was quality companies, who was registered to do business as quality companies at the time with the Indiana Secretary of State, as they were required to do. The signature line says the purchaser is quality equipment sales by Danny Williams. Then on the backside of the purchase agreement, in paragraph 7, it says, the undersigned hereby represents and warrants that has authority to sign the contract on behalf of the purchaser, which is quality equipment sales. I mean, that alone puts them on notice of inquiry of who the purchaser is on this stuff. So at that point in time, back in 2015, in February, when they first started talking about these, that they should go figure out who quality equipment sales is. But if you look at what transpired after that, it's not like Fleet didn't know who they were dealing with. Danny Williams always responded as VP of quality companies. There wasn't a hidden fact as to who was actually the purchaser under these purchase agreements. What about this argument that they were apparently divisions, and they were represented that they were divisions, as opposed to wholly owned subsidiaries? Well, the divisions reference was on the website. But if you look at Danny Williams' signature block, if we're going to look at signature blocks, it says quality companies LLC. One of the press releases says Celadon Group operates through its subsidiary companies. I mean, this is all technical language that Fleet should have been aware of. They were well aware of it. They're really just bringing Celadon in because they think they have deeper pockets at the end of the day. With that, thank you very much. Very quickly, first of all, we could find no cases that held that when you failed to pay the cash deposit, an earnest deposit, that isn't a material breach. A case right on point is the Hawkins case out of Missouri that held in this very same sort of situation. They failed a cash deposit. The non-breaching party, the seller, was no longer limited to the liquidated damages provision. Again, the word may is the option that we're given under the contract that gives us the option to go one way or the other. I misspoke earlier, Your Honor, in answer to your question about what happens if we breach, what do they get? They get not just what they paid us. They get that liquidated damage amount. I misspoke earlier. And on the issue of Celadon Group being liable here, there's no question. One, we thought we were dealing with Celadon. There's no question about we thought we were dealing with Celadon. And had we known differently, we'd have done things differently. And filing with, registering the name in the state of Indiana does not eliminate all the evidence that shows that they were doing business as, and they authorized Danny Williams to act for Celadon Group. Thank you. We ask that you reverse the summary judgment rulings of the district court. Thank you. Very well. Counsel, thank you for your arguments and appearance today. Case will be submitted and decided in due course.